# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 11-10004-02-EFM

RAUL AMBRIZ-VALENZUELA,

*Defendant.*

## MEMORANDUM AND ORDER

Before the Court is Defendant Raul Ambriz-Valenzueala's Motion to Dismiss (Doc. 24), Motion to Suppress Detention and Search (Doc. 25), Motion to Suppress Statements (Doc. 26), and Motion to Suppress (Doc. 37). This Court held a hearing on June 15, 2011. For the following reasons, the Court denies Defendant's Motion to Dismiss (Doc. 24), Motion to Suppress Detention and Search (Doc. 25), and Motion to Suppress Statements (Doc. 26. The Court grants Defendant's Motion to Suppress (Doc. 37) to the extent it was based on the government's 404(b) motion.

### I. Background

On December 13, 2010, at approximately 4:00 p.m., an agent with the United States Department of Homeland Security contacted Lieutenant Robert Walker of the Pratt Police Department. The agent asked if Lt. Walker could go to the Pratt airport because Homeland Security believed that an airplane had just landed, was refueling, and contained illegal drugs and possibly

illegal aliens on board. The agent gave Lt. Walker the tail number of the airplane and told Lt. Walker that there were two Hispanic males.

Lt. Walker and Officer Chris Chisham traveled to the Pratt airport in separate vehicles. Upon arrival, Lt. Walker observed the airplane and walked into the lobby of the building. Lt. Walker saw a Hispanic male dressed in a flight suit and testified that he swallowed hard. Lt. Walker approached the Hispanic male, later identified as Defendant Carlos Alfredo-Pinto, and asked him if he was the owner of the airplane being fueled. Pinto stated that the airplane belonged to him. Lt. Walker asked if he could talk to Pinto outside.

After they went outside, Lt. Walker told Pinto that he did not have to stay and talk to him, but Pinto agreed to talk to Walker. Lt. Walker asked about his flight trip, and Pinto stated that he was going to Kansas City. When Walker asked whether it was Kansas City, Kansas or Kansas City, Missouri, Pinto stalled and avoided eye contact. Lt. Walker then asked if he could search his plane. Pinto responded by asking "mine?" When Lt. Walker indicated Pinto's airplane, Pinto agreed to the search. Because it was cold outside, Lt. Walker asked Pinto to sit in his patrol car.

During the time Lt. Walker was talking to Pinto outside, a second Hispanic male, later identified as Defendant Raul Ambriz-Valenzuela, also dressed in a flight uniform, came out of the restroom and outside. Lt. Walker told Ambriz-Valenzuela that he could sit in his patrol car while he searched the airplane. Ambriz-Valenzuela said okay and walked over and got in the passenger seat of the patrol car.

Upon searching the airplane, Lt. Walker found a bag containing twenty black kilo sized packages inside. Lt. Walker returned to the patrol cars. Pinto had gotten out of the car, and Lt. Walker went over and arrested him and told Officer Chisham to handcuff and arrest Ambriz-

Valenzuela. Lt. Walker then got inside his patrol car in the driver's seat with Ambriz-Valenzuela still in the passenger seat. Ambriz-Valenzuela asked "what's going on?" in English. Lt. Walker read Ambriz-Valenzuela his *Miranda* rights in English from his *Miranda* card. After being read his *Miranda* rights, Ambriz-Valenzuela agreed to talk to Lt. Walker. Lt. Walker told Ambriz-Valenzuela that he found drugs in the airplane, and Ambriz-Valenzuela asked "cocaine?" Lt. Walker responded with "I don't know, is it cocaine?" Ambriz-Valenzuela did not answer.

Lt. Walker later performed a field test on the drugs, and it indicated positive for cocaine. Lt. Walker took Pinto, Ambriz-Valenzuela, and the 20 kilos of cocaine back to the Pratt law enforcement center at approximately 5:30 p.m. and placed Pinto and Ambriz-Valenzuela in different rooms. Two agents from the Department of Homeland Security, John Ferreira and Erin Russell, came to Pratt to interview Pinto and Ambriz-Valenzuela at approximately 8:00 p.m. The agents interviewed Pinto first, and Pinto agreed to cooperate and assist in a controlled delivery in St. Louis, Missouri.

The agents then interviewed Ambriz-Valenzuela. Agent Ferreira had a brief introductory conversation and read Ambriz-Valenzuela his *Miranda* rights in English. Both Lt. Walker and Agent Russell were present when Agent Ferreira gave the *Miranda* warning. Ambriz-Valenzuela told Agent Ferreira that Pinto was the owner of the aircraft and that it was a piece of junk. Ambriz-Valenzuela stated that this was the second time he had piloted the airplane and that they were going to St. Louis to pick up some passengers to take back to Compton, California. Agent Ferreira asked Ambriz-Valenzuela if he knew why he was under arrest, and Ambriz-Valenzuela said because cocaine was found in the aircraft. Ambriz-Valenzuela told Agent Ferreira that he did not have any

prior knowledge about the cocaine. Ambriz-Valenzuela also stated that he would like to help himself, but he did not know anything about the cocaine.

Ambriz-Valenzuela was then booked into the Pratt County jail at approximately 9:00 p.m. on the charge of possession with the intent to distribute. The next morning, December 14, 2010, two pilots, Lt. Walker, Agent Ferreira, Agent Russell, Pinto, and Ambriz-Valenzuela flew to St. Louis, Missouri to attempt the controlled delivery. Nobody remembers specifically asking Ambriz-Valenzuela if he wanted to go to St. Louis or remembers telling him why they were going to St. Louis. After arriving at the airport in St. Louis, agents from Homeland Security in St. Louis met the plane. Pinto, Ambriz-Valenzuela, Lt. Walker, and Agent Russell went to Homeland Security's offices in St. Louis. Ambriz-Valenzuela was immediately taken into enforcement and removal operations custody, the administrative deportation section of Homeland Security. Pinto attempted the controlled delivery, but it was not successful.

The following day, December 15, 2010, a complaint was filed in the Eastern District of Missouri charging Pinto and Ambriz-Valenzuela with a violation of 21 U.S.C. § 846, conspiracy to distribute in excess of five kilograms of cocaine. On December 16, 2010, a complaint was filed in the District of Kansas charging Pinto and Ambriz-Valenzuela with a violation of 21 U.S.C. § 846, a conspiracy to distribute in excess of five kilograms of cocaine. On December 22, 2010, the charges were dismissed in Missouri, and the defendants were moved to Kansas.

On January 4, 2011, Pinto and Ambriz-Valenzuela were indicted in the District of Kansas. On May 26, 2011, a Superseding Indictment was returned, charging Pinto and Ambriz-Valenzuela with conspiracy to distribute cocaine (21 U.S.C. § 846); possession with the intent to distribute a

controlled substance and aiding and abetting (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2); and interstate and foreign travel in aid of racketeering enterprises (18 U.S.C. § 1952(a)(3)).

## II. Analysis

### A. *Motion to Dismiss (Doc. 24)*

Defendant Ambriz-Valenzuela argues that the case should be dismissed pursuant to Federal Rules of Criminal Procedure 5(a) and 5(c) because unnecessary delay occurred while Ambriz-Valenzuela was moved from the location of the alleged offense to another location and back again.[1] Although Ambriz-Valenzuela does not provide the specific timeframe or provide the time that he believes should be counted as unnecessary delay, the Court provides the following timeframe. On December 13, 2010, Ambriz-Valenzuela was arrested on state charges at approximately 4:30 p.m. He was questioned by agents from the Department of Homeland Security at approximately 8:45 p.m., but he was kept overnight in the Pratt County Jail. On the morning of December 14, 2010, Ambriz-Valenzuela was taken to St. Louis, Missouri with Lt. Walker of the Pratt Police Department, and two agents from the Department of Homeland Security. As noted above, there is no evidence that Ambriz-Valenzuela agreed to go to Missouri, but he did not specifically state that he would not go. Once they arrived in Missouri, Ambriz-Valenzuela was taken into administrative custody, enforcement and removal operations, by the Department of Homeland Security. The next day, December 15, Ambriz-Valenzuela was charged by criminal complaint in the Eastern District of Missouri and was shortly thereafter arrested on those charges. Ambriz-Valenzuela appeared before

---

[1]Ambriz-Valenzuela also cites to Fed. R. Crim. P. 48 for the proposition that the Court can dismiss the case. Rule 48 provides that "[t]he court may dismiss an indictment, information, or complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Defendant does not assert that delay occurred with respect to any of these categories, and the Court finds that none of the three categories are at issue. As such, Rule 48 is inapplicable to this case.

a magistrate in St. Louis. The District of Kansas also filed a complaint against Ambriz-Valenzuela on December 16. The Eastern District of Missouri then dismissed the charges against Ambriz-Valenzuela, and he was moved to Kansas.[2] An indictment was filed on January 4, 2011.[3]

Fed. R. Crim. P. 5(a)(1) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(c)(1) provides that "[i]f the defendant is arrested in the district where the offense was allegedly committed: (A) the initial appearance must be in that district . . . ." Ambriz-Valenzuela asserts that his initial appearance should have been in front of a magistrate in Kansas. However, when Ambriz-Valenzuela was arrested in Kansas, he was arrested on state charges. Rule 5(a) does not become applicable until the accused is taken into federal custody.[4]

In certain instances, when a defendant can demonstrate that a delay occurred due to a "working arrangement" between federal and state authorities, state custody may be treated as federal custody for purposes of Rule 5(a).[5] Ambriz-Valenzuela argued during the suppression hearing that the federal government was involved in the case from the beginning as the tip came from the federal government. After Ambriz-Valenzuela was arrested and placed in state custody, agents from Homeland Security came out to question him, and the following morning, both state and federal

---

[2]Ambriz-Valenzuela was transferred back to Kansas pursuant to Rule 5(c)(3).

[3]The docket indicates that Ambriz-Valenzuela's initial appearance before Magistrate Judge Gale occurred on January 18, 2011. (Doc. 9).

[4]*See United States v. Torres*, 663 F.2d 1019, 1023 (10th Cir. 1981). Ambriz-Valenzuela was not arrested on federal charges until he was in Missouri.

[5]*Id.* at 1023-24; *see also United States v. Arriola-Perez*, 137 F. App'x 119, 126 (10th Cir. 2005) (citing *Torres*, 663 F.2d at 1023). Generally, "there are few instances in which a working arrangement has been found to exist." *Torres*, 663 F.3d at 1024.

officials accompanied Ambriz-Valenzuela on an airplane ride from Kansas to St. Louis, Missouri. Furthermore, when Ambriz-Valenzuela arrived in Missouri, he was placed in enforcement and removal operations custody, the administrative deportation section of Homeland Security for approximately two days.[6] It appears that Ambriz-Valenzuela was in state custody when he was first arrested and while he remained in the Pratt County Jail. However, once Ambriz-Valenzuela was taken by airplane with both state and federal officials and crossed state lines, it becomes unclear whose custody Ambriz-Valenzuela was in for several days until his arrest on federal charges.

In any event, assuming that Ambriz-Valenzuela was in federal custody as of December 14 and construing the irregularity of moving Ambriz-Valenzuela to Missouri as an unnecessary delay in violation of Rules 5(a) and 5(c), dismissal of the complaint is not a remedy. There is sparse case law regarding a possible violation of Rule 5(c) in conjunction with Rule 5(a). However, the majority of courts addressing whether dismissal is appropriate when Rule 5(a) is violated hold that dismissal is inappropriate. Generally, these courts find that the only remedy available under Rule 5(a) is suppression of any evidence obtained during the delay, and if there is no evidence to suppress, dismissal is not an appropriate alternative remedy.[7]

---

[6] Ambriz-Valenzuela's citizenship status is unclear to the Court. The Court notes that several circuits have determined that Fed. R. Crim. P. 5(a) is only applicable to criminal arrests and does not apply to civil detentions unless the defendant can demonstrate collusion between immigration and criminal prosecution officials. *See United States v. Garcia-Echaverria,* 374 F.3d 440, 451-52 (6th Cir. 2004)*; United States v. Encarnacion,* 239 F.3d 395, 398-99 (1st Cir. 2001); *United States v. Noel*, 231 F.3d 833, 836-37 (11th Cir. 2000).

[7] *Garcia-Echaverria,* 374 F.3d at 452 (noting that generally the appropriate remedy for a violation of Fed. R. Crim. P. 5(a) is suppression of statements and the district court properly denied the defendant's motion to dismiss on that basis); *United States v. Dyer*, 325 F.3d 464, 470 n. 2 (3d Cir. 2003) ("[E]ven if the government had violated Fed.R.Crim.P. 5(a), the remedy for such a violation is not dismissal of the indictment. Rather, since the provisions of Fed.R.[Crim.]P. 5(a) are procedural, not substantive, the sanction imposed by federal courts for failure to comply with Rule 5(a) is suppression of statements taken during the period of unnecessary delay.") (internal quotations and citation omitted); *Bayless v. United States*, 381 F.2d 67, 70-71 (9th Cir. 1967) (determining that a violation of Rule 5(a) requires exclusion of statements obtained during the unnecessary delay, and there being no evidence to exclude, the district court did not err in denying the defendant's motion to dismiss the indictment); *United States v. Fernandez*, 500 F. Supp. 2d. 661, 666-67 (W.D. Tex. 2006) (determining that dismissal is not an appropriate remedy for an alleged Rule 5(a)

In this case, there is nothing to suppress. The Tenth Circuit has not decided whether a violation of Rule 5(a) is grounds for dismissal.[8] However, the Tenth Circuit has determined that the purpose of Rule 5(a) "is to prevent invalidly obtained confessions and perhaps other evidence prior to allowing the accused to have access to the court."[9] Several times, the Tenth Circuit has stated that the remedy for a violation of Rule 5(a) is suppression of any statements made during the period of unnecessary delay.[10]

This Court finds persuasive and adopts the holdings of other courts finding that a violation of Rule 5(a) does not provide for the remedy of dismissal. As the Tenth Circuit has noted, Rule 5(a) is essentially a codification of the *McNabb-Mallory* rule, the purpose of which was to prevent police from obtaining confessions during a period of delay.[11] Here, there is nothing to suggest that the government was attempting to obtain a confession or other evidence from Ambriz-Valenzuela. It

---

violation); *United States v. Melendez*, 55 F. Supp. 2d 104, 109 (D.P.R. 1999) (determining that a violation of Rule 5(a) may require dismissal of an indictment under limited circumstances where "(1) evidentiary suppression of a statement is not a potential remedy because there is no statement to suppress, (2) the defendant was incarcerated solely as a result of the Rule 5(a) violation and likely would not have been incarcerated otherwise, and (3) the delay in bringing the defendant before the magistrate was egregiously lengthy." The District of Puerto Rico ultimately concluded that factors two and three were not met and therefore denied the defendant's motion to dismiss the indictment); *United States v. Cabral*, 1998 WL 1543567, at *8-9 (D. Mass. 1998) (determining that dismissal of the indictment was not an appropriate remedy as the defendant's substantive due process rights were not violated although Rule 5(a) was violated); *United States v. DiGregorio*, 795 F. Supp. 630, 633-34 (S.D.N.Y. 1992) (denying motion to dismiss indictment for violation of Rule 5(a) where defendants were held for five months before being brought before a judicial officer because the appropriate remedy was suppression of any prejudicial statements made during the delay). *But see United States v. Osunde*, 638 F. Supp. 171, 176-77 (N.D.Cal. 1986) (dismissing the indictment for a violation of Rule 5(a) where the defendant was held in custody for 106 days prior to appearing before a judge but noting that it could not point to any case law supporting dismissal).

[8]*Arriola-Perez*, 137 F. App'x at 126 n.4 ("The facts of this case do not require us to opine on the disputed question, not yet addressed by this court, whether a violation of Rule 5(a)(1) or Rule 9(c)(1) is grounds for dismissal as well as suppression of an illegally obtained confession.").

[9]*Torres*, 663 F.2d at 1023.

[10]*Id.; Arriola-Perez*, 137 F. App'x at 126; *Walton v. United States*, 334 F.2d 343, 346 (10th Cir. 1964) (citations omitted).

[11]*Torres*, 663 F.2d at 1023.

appears that both the Eastern District of Missouri and the District of Kansas believed it should prosecute Ambriz-Valenzuela, and both tried to do so.[12] Furthermore, dismissal is an extreme remedy.[13] At most, three days passed before Ambriz-Valenzuela was presented before a magistrate judge. Although he was presented before a magistrate in Missouri, Ambriz-Valenzuela was arrested in Missouri on federal charges, and his initial appearance was therefore in the district where the offense he was charged with was allegedly committed. He was then subsequently transferred back to the District of Kansas when the Eastern District of Missouri dismissed the charges against him. As such, the Court denies Ambriz-Valenzuela's motion to dismiss.

### *Motion to Suppress Detention and Search (Doc. 25)*

Ambriz-Valenzuela also moves to suppress his detention and the search of the airplane and all evidence seized from the airplane. Before addressing the merits of Ambriz-Valenzuela's motion, the Court must address whether Ambriz-Valenzuela had a legitimate or reasonable expectation of privacy in the airplane.

Unless a defendant demonstrates that his own Fourth Amendment right to privacy has been violated, a defendant may not challenge an allegedly unlawful search or seizure.[14] "Whether a defendant's own Fourth Amendment rights were violated by a challenged search turns on the classic Fourth Amendment test: whether the defendant manifested a subjective expectation of privacy in

---

[12] Agent Russell testified that it was her understanding that Defendant was going to be prosecuted in Missouri.

[13] Rule 48 specifically provides for dismissal in certain circumstances (not present in this case), and the Tenth Circuit has cautioned courts in exercising its discretion in dismissing cases under Rule 48(b)(1) that the defendant must demonstrate prejudice. *See United States v. Begay*, 602 F.3d 1150, 1154 (10th Cir. 2010). In this case, Defendant does not assert how he was prejudiced.

[14] *See United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009).

the area searched and whether society is prepared to recognize that expectation as objectively reasonable."[15]

Generally, in the context of automobile searches, a defendant bears the burden in establishing that he has a "legitimate possessory interest in or [a] lawful control over the car."[16] Several factors that are important in determining this issue include: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle."[17] A defendant's mere presence, or possession of car keys, is insufficient to demonstrate a legitimate possessory interest.[18]

Although this case does not involve an automobile, but rather an airplane, the same principles apply. The evidence demonstrates that at the Pratt airport, co-Defendant Pinto told Lt. Walker that the airplane was his, and Pinto gave consent to search it. Ambriz-Valenzuela offered no evidence that he was the owner of the airplane or the owner of any of the items in the airplane. In contrast, Agent Ferreira testified that Ambriz-Valenzuela told him that the airplane was Pinto's. There is no evidence that Ambriz-Valenzuela had a reasonable expectation of privacy in the airplane. As such, Ambriz-Valenzuela cannot show that his expectation of privacy in the airplane

---

[15] *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (citation and internal quotations omitted).

[16] *Id.* (citation omitted).

[17] *Id.*

[18] *Id.*

-10-

is one that society would recognize as reasonable, and he cannot suppress the evidence seized from the airplane based on any possessory interest.

However, Ambriz-Valenzuela also argues that he was detained without legal cause, or without articuable suspicion, and therefore he requests suppression of his detention and any evidence coming from his detention. "[A]lthough a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention."[19] A defendant must first establish that the detention violated his Fourth Amendment rights.[20] Next, the defendant must demonstrate "a factual nexus between the illegality and the challenged evidence."[21] To show a factual nexus, "[a]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[22]

The first question in this case, however, is whether Ambriz-Valenzuela was detained in violation of his Fourth Amendment rights. At the suppression hearing, the government argued that there was no detention, and this was a consensual encounter. Ambriz-Valenzuela argues that he was detained without articuable suspicion.

---

[19] *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

[20] *Id.*

[21] *Id.* (quotation and citation omitted)

[22] *Id.*

"Consensual encounters do not implicate the Fourth Amendment."[23] "An encounter is consensual if the defendant 'is free to leave at any time during the encounter.'"[24] The encounter transforms from consensual to a seizure "when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way."[25] Factors that may be important in determining whether an individual has been seized include:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of a person's personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.[26]

Another relevant factor is whether the individual was advised that he is free to leave.[27] However, "an officer's failure to inform the defendant that []he is free to leave, standing alone, does not make an encounter nonconsensual."[28] No one factor is dispositive, and the court must consider all the circumstances surrounding the encounter.[29]

Here, Lt. Walker spoke with Pinto outside. Lt. Walker told Pinto that he was free to go, but Pinto gave him consent to search the airplane. While Lt. Walker was speaking with Pinto, and after receiving consent to search the airplane, Ambriz-Valenzuela walked outside. Lt. Walker informed

---

[23] *See United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008).

[24] *United States v. Esparza-Mendoza*, 386 F.3d 953, 957 (10th Cir. 2004) (quotation and citation omitted).

[25] *Id.* (quoting *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996)).

[26] *United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010) (citing *United States v. Rogers*, 556 F.3d 1130, 1137-38 (10th Cir. 2009)).

[27] *Id.* (citing *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006)).

[28] *Ledesma*, 447 F.3d at 1315 (citing *United States v. Drayton*, 536 U.S. 194, 206 (2002)).

[29] *Fox,* 600 F.3d at 1258.

Ambriz-Valenzuela that Pinto had agreed to a search of the airplane, and he told Ambriz-Valenzuela that if he was cold, he could go sit in his patrol car. Ambriz-Valenzuela said okay and walked to the patrol car. There is no evidence that Lt. Walker's presence was threatening or aggressive. The encounter occurred at the Pratt airport in an outside area for a few minutes.. There does not appear to be retention of any of Ambriz-Valenzuela's personal effects. Although Lt. Walker did not specifically tell Ambriz-Valenzuela that he was free to leave, he also did not order him to sit in his patrol car. The whole encounter took a few minutes, and Lt. Walker immediately searched the airplane and found the drugs. Based on the evidence in front of the Court, this was a consensual encounter. Because this was a consensual encounter, and not an illegal detention, Ambriz-Valenzuela's Fourth Amendment rights are not implicated, and he cannot contest the lawfulness of his detention or any evidence obtained from an illegal detention.[30]

### *Motion to Suppress Statement (Doc. 26)*

Ambriz-Valenzuela also moves to suppress his statement after being arrested. He contends that he is a Spanish speaker and did not understand his constitutional rights and therefore he did not knowingly, voluntarily, and intelligently waive his constitutional rights. The Court finds that the evidence demonstrates otherwise.

---

[30]Even if this could be construed as a detention, there was articulable suspicion and the stop was reasonably related in scope to the circumstances. Lt. Walker received a phone call from the Department of Homeland Security informing him of an airplane possibly containing illegal drugs and illegal aliens. Lt. Walker was given the tail number of the airplane, and when he arrived at the Pratt airport, he observed the airplane. After speaking with Pinto, Lt. Walker obtained consent to search the airplane and immediately searched the airplane. Shortly thereafter, he found drugs and immediately arrested both Pinto and Ambriz-Valenzuela. Accordingly, even if this could be construed a detention, it was proper. Furthermore, Ambriz-Valenzuela cannot demonstrate that but for his detention, the evidence in the airplane would not have been discovered. Pinto, the owner of the airplane, gave consent to search the airplane, and based on this consent, the drugs were found. As such, there is no factual nexus between Ambriz-Valenzuela's detention and the seizure of the cocaine.

A waiver of *Miranda* rights must be done voluntarily, knowingly, and intelligently.[31] "Whether [defendant] understood his *Miranda* rights is a question of fact, which underlies the legal question of whether his waiver was knowing and intelligent."[32] To determine whether a statement is voluntary, a court considers "the characteristics of the defendant, the circumstances surrounding the statements, and the tactics employed by police."[33]

Before Ambriz-Valenzuela was arrested, Lt. Walker spoke to Ambriz-Valenzuela in English and told Ambriz-Valenzuela that he could sit in his patrol car. Ambriz-Valenzuela responded by saying "okay" and walked over and sat in the patrol car. After Ambriz-Valenzuela was arrested, Lt. Walker read Ambriz-Valenzuela his *Miranda* rights in English from a *Miranda* warning card. Lt. Walker believed Defendant spoke English because Ambriz-Valenzuela asked Lt. Walker immediately before he was read his *Miranda* rights "what's going on?" in English and he had previously spoken to him in English. When Lt. Walker asked Ambriz-Valenzuela questions in English, Ambriz-Valenzuela responded in English. Agent Ferreira also gave Ambriz-Valenzuela his *Miranda* rights in English. After reading Ambriz-Valenzuela his *Miranda* rights, Agent Ferreira spoke to him in English, and Ambriz-Valenzuela responded in English. As such, it does not appear that Ambriz-Valenzuela had problems comprehending or understanding the *Miranda* rights given in English.[34]

---

[31] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[32] *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000) (citations omitted).

[33] *United States v. Toro-Pelaez*, 107 F.3d 819, 825-26 (10th Cir. 1997).

[34] *Valdez*, 219 F.3d at 1231 (finding that the defendant understood English and rejecting his assertion that his consent was not knowingly or intelligently given); *see also United States v. Sanchez-Chaparro*, 392 F. App'x 639, 644-45 (10th Cir. 2010) (concluding that the district court did not err in finding that the defendant knowingly and intelligently waived his *Miranda* rights when the defendant generally responded and conversed in English).

In addition, the government also put on evidence from Joseph Behrends, an employee of the FAA. Behrends testified that the FAA requires an individual obtaining a pilot's license to take three tests. There are two written tests and a practical exam, consisting of an oral portion and flight portion. All tests are required to be given in English. Furthermore, one of the qualifications to hold a pilot's license is that the individual has the ability to read, speak, write, and understand the English language.[35] Ambriz-Valenzuela's pilot's license and his airman file were admitted into the record, and Ambriz-Valenzuela's airman record indicated that he passed his written tests with scores of 97% and 90% and that Ambriz-Valenzuela was English proficient. Based on the evidence presented, the Court concludes that Ambriz-Valenzuela understood his rights and knowingly, voluntarily, and intelligently waived his *Miranda* rights.

Ambriz-Valenzuela also brings up the six-hour rule under 18 U.S.C. § 3501(c) and asserts that is unclear from the timeframe when Ambriz-Valenzuela made his statement. "Federal law requires an arrestee to be promptly presented to a federal magistrate judge."[36] "Failure to bring an arrestee before a magistrate promptly may result in the exclusion of a confession."[37] Pursuant to § 3501(c):

> In any criminal prosecution by the United States . . . , a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the

---

[35]*See* 14 C.F.R. § 61.83 and 14 C.F.R. § 61.103.

[36]*United States v. Smith*, 606 F.3d 1270, 1278 (10th Cir. 2010) (citing *Corley v. United States*, --- U.S. ---, 129 S.Ct. 1558, 1563, 173 L.Ed.2d 443 (2009)). The Court previously addressed Defendant's argument with respect to Rule 5(a).

[37]*Id.*

trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention.

In construing § 3501(c), "the Supreme Court recognizes the six-hour period between arrest and confession acts as a safe harbor against claims of improper delay.[38] However, "the presentment rule does not begin to operate, and the six-hour safe harbor period is not implicated until a person is arrested for a federal offense.[39]

In this case, Ambriz-Valenzuela spoke with Lt. Walker of the Pratt Police Department on December 13, at approximately 4:30 p.m., immediately after he was arrested on state charges. Ambriz-Valenzuela spoke with Agent Ferreira of Homeland Security on December 13, at approximately 8:45 p.m, while Ambriz-Valenzuela was still in state custody. Ambriz-Valenzuela was not arrested on a federal charge until December 15, 2010. As such, 18 U.S.C. § 3501(c) is inapplicable to the facts of this case.[40] Accordingly, Ambriz-Valenzuela's Motion to Suppress Statements is denied.

### *Motion to Suppress (Doc. 37)*

Ambriz-Valenzuela also filed a motion to suppress the stop and search of Ambriz-Valenzuela occurring on August 24, 2007 and all evidence stemming therefrom. During the hearing, the government withdrew its 404(b) notice (Doc. 32) which largely resolves Ambriz-Valenzuela's

---

[38]*Id.* (citing *Corley*, 129 S.Ct. at 1571).

[39]*Id.* (citing *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994)).

[40]Even if Ambriz-Valenzuela was arrested on federal charges or could be considered to be in federal custody at 4:30 p.m. on December 13, 2010, his statements were all within six hours of his arrest and would not violate the presentment rule.

Motion to Suppress. As such, the Court grants Ambriz-Valenzuela's Motion to Suppress to the extent it was based on the 404(b) motion.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (Doc. 24) is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Detention and Search (Doc. 25) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Statement (Doc. 26) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress (Doc. 37) is **GRANTED** to the extent it was based on the 404(b) motion.

**IT IS SO ORDERED**.

Dated this 28th day of June, 2011.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE